# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4785 | **DATE** | 8/16/2000 |
| **CASE TITLE** | U.S.A. vs. Hartz Construction Co., Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for partial summary judgment [32] is granted as to Count IV, but is denied as to Count V. Defendant's cross-motion for partial summary judgment [41] is denied. Plaintiff's motion to strike affirmative defenses [37] is granted in part and denied in part. Defendant's fifth and twenty-first affirmative defenses are stricken in their entireties. The eleventh, eighteenth, and nineteenth affirmative defenses are stricken in part. Plaintiff shall submit a brief proposing an appropriate penalty under Count IV by September 8, 2000. Defendant shall respond by September 22, and plaintiff shall reply by October 6.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | AUG 18 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 63 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 00 AUG 17 PM 3: 28 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

AUG 18 2000

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98 C 4785 |
| | ) | |
| HARTZ CONSTRUCTION CO., INC., | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The United States brought this action against Hartz Construction Co. under §§ 309(b), (d) and 404(s) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b), (d), 1344(s), for discharging pollutants into waters of the United States without a permit or in violation of a permit, in violation of §§ 301(a) and 404 of the Act, 33 U.S.C. §§ 1311(a), 1344, at construction sites in Alsip and Country Club Hills, Illinois. Hartz is also sued for failing to provide information regarding the sites requested by the United States Environmental Protection Agency ("EPA") pursuant to § 308 of the Act, 33 U.S.C. § 1318. The parties have each moved for summary judgment on the counts related to Hartz's failure to provide information requested by the EPA. The United States has also moved to strike certain of Hartz's affirmative defenses.

The Clean Water Act prohibits "the discharge of dredged or fill material into the navigable waters" without a permit. 33 U.S.C. § 1344(a). "Navigable waters" are "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The statute does not define "waters of the United States." Consequently, the EPA and the United States Army Corps of Engineers ("Corps") promulgated regulations defining the term. The Corps' regulations state that "waters of the United States" include "[a]ll other waters such as intrastate lakes, rivers,

streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs . . . the use, degradation or destruction of which could affect interstate or foreign commerce . . . ." 33 C.F.R. 328.3(a)(3). The Corps explain that the term "other waters" includes those which "are or would be used as habitat by other migratory birds which cross state lines." 51 Fed. Reg. 41,217 (Nov. 13, 1986) ("the migratory bird rule"). Wetlands adjacent to waters of the United States (other than waters of the United States that are themselves wetlands) are also subject to the Clean Water Act. 33 C.F.R. 328.3(a)(7); 40 C.F.R. 230.3(s)(7), 232.2; *see United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 138 (1985). In this case, the United States asserts that the Hartz wetlands are covered by the "other waters" provision because at least one of the wetlands is used by migratory birds and one is adjacent to navigable waters.

The United States has brought a five-count complaint against Hartz. The first count alleges that Hartz violated § 301 of the Clean Water Act, 33 U.S.C. § 1311, by discharging pollutants into waters of the United States at the Alsip site without a § 404 permit in October 1993. The second count alleges that Hartz violated the EPA's May 31, 1994 compliance order, thereby violating § 309 of the Act, 33 U.S.C. § 1319, by discharging pollutants into waters of the United States at the Alsip site subsequent to the order's issuance. The pollutants were also discharged without a § 404 permit, thereby violating § 301 of the Act. The third count alleges that Hartz violated § 301 of the Act by discharging pollutants into the waters of the United States at the Country Club Hills site without a § 404 permit, or in violation of a § 404 permit.

The fourth and fifth counts are the subjects of the parties' current cross-motions for partial summary judgment. In the fourth count, the United States alleges that Hartz failed to comply with the EPA's March 22, 1994 information request under § 308 of the Act by failing to

identify an October 12, 1993 delineation of the Alsip site by the organization ENCAP. The fifth count alleges that Hartz failed to comply with an August 11, 1994 § 308 request from the EPA by failing to describe its conversations with contractors regarding its plans to regrade and discharge fill material into the fill area at the Country Club Hills site. The parties have cross-moved for summary judgment on the fourth and fifth counts.

## Analysis

### *Cross-Motions for Partial Summary Judgment*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The United States argues that summary judgment in its favor is warranted on Counts IV and V because it is undisputed that Hartz waited seven months before disclosing the ENCAP report – which identified the presence of wetlands at the Alsip site before Hartz's discharge activities began – and because Hartz failed to disclose its discussions concerning plans to fill and regrade 1.1 acres of wetlands designated for preservation at the Country Club Hills site. Both Hartz's own summary judgment motion and its opposition to the United States' motion rest, to a large extent, on a single argument. Hartz contends that, because the EPA did not go to court to compel compliance with its requests prior to Hartz's voluntary responses to those requests, there

3

is now "no Section 308 issue left to adjudicate." (Def.'s Summ. J. Resp. at 2)

Under Hartz's view, the EPA is powerless to challenge a party's § 308 response unless the challenge is made before the response. This argument strains logic. The grounds on which the EPA's challenge is based may arise from the response itself, not simply from the party's failure to respond. Otherwise, the EPA would be precluded from seeking penalties for an insufficient, inaccurate, or untimely response unless they knew of the defects before the response was made. In this case, the EPA was hardly in a position to know that Hartz had withheld the ENCAP report from its initial Alsip response, or that Hartz's Country Club Hills response would fail to describe conversations with contractors, as requested. To require the EPA to go to court to compel the disclosure of such information before learning of its existence, or else forfeit the ability to raise Hartz's omissions and delays before the court, would render the EPA's enforcement powers illusory. Alternatively, to require the EPA to obtain a court order compelling compliance with a request every time the agency seeks information under § 308 would impose an enormous and unnecessary burden on the agency's efforts to enforce the Clean Water Act, as well as on the courts.

Contrary to Hartz's characterization, *United States v. Tivian Labs., Inc.*, 589 F.2d 49 (1st Cir. 1978), does not lend support to its argument. In stating that the EPA's "request for information is not enforceable under the Acts, nor may fines be imposed, until a court order is obtained," the court recognized that "[t]he agency may ask for the data without a court order, but must turn to the court to have its request enforced." *Id.* at 53. This language simply recognizes that the EPA cannot enforce compliance with a § 308 request or impose fines for noncompliance without a court order; nowhere does the *Tivian* court suggest that the EPA cannot seek penalties

for noncompliance after a party has voluntarily responded to the request.

Hartz raises constitutional concerns regarding the EPA's requests and the absence of a court order, noting *Tivian*'s language that "what the fourth amendment requires as a condition to enforcement of an agency subpoena is a showing by the agency (1) that its investigation is authorized by Congress and is for a purpose Congress can order and (2) that the documents sought are relevant to the investigation and adequately described." *Id.* at 54. Hartz also contends that principles of due process require that Hartz be given an opportunity to contest the EPA's requests. In Hartz's view, this opportunity must come before any response is made to the requests.

The court agrees with the general constitutional principles stated by Hartz. The court disagrees, however, with Hartz's suggestion that these principles were violated merely because a court order was not obtained prior to Hartz's response. This court does not believe that the Fourth and Fifth Amendments are violated every time a party responds to a § 308 request without a court order. As noted above, requiring the EPA to obtain a court order before the party responds would needlessly bog down the process by which the EPA obtains information, making its enforcement duties markedly more difficult.

That is not to say that Hartz's constitutional concerns are irrelevant to § 308 requests. Before a party can be compelled to comply with a request, and before a party can be penalized for its failure to comply, the EPA must show that the requests are reasonable within the meaning of § 308, and the party must have an opportunity to challenge that reasonableness. That does not mean, however, that a party can simply ignore a reasonable request without fear of subsequent penalty. If a court finds, after hearing the party's objections, that an ignored or disobeyed request

was reasonable, the court is justified in imposing penalties. To hold otherwise would necessarily inject the courts into every information request issued by the EPA, no matter how routine; a party could disregard with impunity any § 308 request until a court ordered them to respond. Surely if a party deliberately lied in response to a reasonable § 308 request, the party may be subject to penalties even if the response came before the EPA sought court intervention. The responding party is entitled to challenge the request, but, in this court's view, that challenge need only come before a response is compelled, or before a penalty is imposed. There is no indication that the illogic and inefficiency of Hartz's suggested alternative approach was contemplated by § 308's drafters, nor compelled by the Constitution. Hartz has the opportunity to challenge the EPA's requests; that opportunity is here and now.

As to the substance of the EPA's requests, Hartz argues that they are invalid because there are "no regulations or permit conditions requiring the recordkeeping or reporting requested of Hartz." (Def.'s Summ. J. Resp. at 9) The only case cited by Hartz as support, *Natural Resources Defense Council, Inc. v. EPA*, 822 F.2d 104, 118 (D.C. Cir. 1987), addressed challenges brought against regulations promulgated by the EPA under § 308. The *NRDC* court did not hold that only the categories of information set forth in an implementing regulation can be sought in a § 308 request. Section 308 gives the EPA Administrator authority to require owners and operators of point sources to make reports and to "provide such other information as he may reasonably require" in order to "carry out the objective of [the Act]." 33 U.S.C. § 1318(a)(A). The court discerns no reasonable basis – and Hartz has identified no such basis – for limiting the EPA's discretion to requesting only that information that is expressly called for by regulation, rather than simply making reasonable requests, as the statute itself provides.

6

In the same vein, Hartz objects to the EPA's 30-day response deadline for its requests, arguing that "[s]ection 308 does not specify a response period and therefore does not indicate what makes a response 'late.'" (Def.'s Summ. J. Reply at 6)  The court does not believe that the EPA is precluded from setting a reasonable deadline for responses merely because the statute itself does not provide for such a deadline.  Obviously, the factual circumstances will dictate what is a reasonable time period in which a response can be expected in a given case.  The EPA would have considerable difficulty carrying out § 308's dictates if it could not set any time limits for a party's response.

Hartz argues that disobedience of an EPA request is not a § 308 violation that is subject to penalties under § 309(d).  According to Hartz, "[o]ne can 'disobey' the *ad hoc* terms of an EPA request without violating Section 308, which by its plain terms can only be violated by a respondent's not providing requested information before compulsion."  (*Id.* at 8)  The court does not find support for Hartz's characterization in either of the relevant statutory sections.  Section 309(d) provides that "[a]ny person who violates . . . [section 308] . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation."  33 U.S.C. § 1319(d).  There is no indication that certain violations of § 308 are subject to penalty, but others are not.

Section 308, in relevant part, provides that:

[T]he [EPA] Administrator shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods (including where appropriate, biological monitoring methods), (iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (v) *provide such other information as he may reasonably require . . . .*

13 U.S.C. § 1318(a)(A) (emphasis added).

Because Hartz apparently does not dispute its status as an owner or operator of a point source,[1] the EPA is given discretion to request information from it that is reasonably required to carry out the purposes of the Act. The court can discern no "plain terms" limiting violations of § 308 to a "respondent's not providing requested information before compulsion." (Def.'s Summ. J. Reply at 8) If the EPA's requests were reasonable, Hartz's seven-month delay in providing a responsive report regarding the Alsip site, and complete failure to provide responsive information within its possession regarding the Country Club Hills site, constituted a violation of § 308, which is subject to penalty under § 309(d).

Given the court's rejection of Hartz's legal challenges to the EPA's entitlement to penalties, the court must determine if Hartz has raised a factual dispute regarding the reasonableness of the EPA's § 308 requests, or the responsiveness of Hartz's answers. If Hartz has failed to do so, the EPA is entitled to summary judgment on Counts IV and V of its complaint.

On March 22, 1994, the EPA issued a § 308 request to Hartz regarding its Alsip site. Request 8 asked Hartz to:

> Provide all documentation, including but not limited to, field notes and maps, concerning the efforts of you or Hartz Construction, or its employees and agents, to determine whether the site or any portion thereof contained wetlands; [sic] prior to the land clearing.

(Pl.'s Ex. 9, Request 8)

Request 9 of the Alsip request asked Hartz to:

State whether the physical and biological characteristics of the Site have been

---

[1] A point source is "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

observed and examined in environmental studies (i.e. topographical surveys, soil boring/sample data, vegetation surveys, hydrological surveys, etc.) before or after the dates identified in [Request] No. 4, above. Describe the nature, purpose and scope of any environmental studies conducted. In addition, state whether the Site was delineated for jurisdictional wetlands prior to the dates identified in [Request] No. 4, above. Identify the persons and contractors responsible for any environmental studies and jurisdictional wetland delineations at the Site, and provide a copy of all studies and/or reports. The requested information should be organized chronologically.

(*Id.*, Request 9)

The response provided by Hartz on April 20, 1994 did not disclose the existence of the ENCAP report in response to these requests. It was not until November 21, 1994, that Hartz submitted the ENCAP report to the EPA as an exhibit to Hartz's Petition to Withdraw Complainant's Findings of Violation and Compliance Order.

Hartz has never explained its reason for the belated disclosure, and in fact "denies that any explanation was necessary." (Def.'s Resp. to Rule 12(M) Statement ¶ 29) Hartz also "denies that making, creating, or disclosing the report was required by Section 404 regulations," and denies that the report's submission "was untimely under the jurisprudence of Section 308 enforcement." (*Id.*) These arguments were rejected above. Section 308 does not limit the EPA's requests to only that information that is expressly called for by regulation, nor is the EPA precluded from setting reasonable deadlines for § 308 responses.

Apart from these legal challenges, Hartz has raised no objections to the factual reasonableness of the EPA's requests, nor does Hartz contend that it was justified in withholding the ENCAP report. The fact that Hartz, in its answer to the complaint, "denied that the flawed EnCap report was relevant to Alsip" (Def.'s Summ. J. Reply at 2) does not give rise to a material issue of fact. The ENCAP report focused on the Alsip site; Hartz must do more than offer a

conclusory denial of its relevance to preclude summary judgment. Hartz has not explained why the EPA's 30-day time limit was unreasonable, nor why it took an additional seven months to disclose the ENCAP report – a report that was in Hartz's possession before the initial response was due. Given the EPA's showing that the requests were reasonably related to its efforts to determine whether a violation of the Clean Water Act took place, the EPA is entitled to summary judgment on Count IV.

As for the Country Club Hills site, under the terms of a § 404 permit governing the site, Hartz was required to mitigate for the loss of filled wetlands through "the wetland creation of 6.8 acres and the preservation of 1.1 acres of existing sedge meadow." (Pl.'s Exh. 18 at 1) Hartz was also required to obtain approval of any plan revisions that would "alter the essential character and intent of the proposed project or cause to increase the 'loss or substantial adverse modification' of wetlands." (Id. at 2, ¶ 4) In August 1993, Hartz's contractors performed excavation work on the parcel designated for preservation. The EPA alleges that the contractors later redeposited vegetation and topsoil back onto the parcel, but Hartz admits only that it salvaged and replaced topsoil and wetland vegetation. Hartz denies that it "'redeposited' dirt within the meaning of regulations requiring Section 404 authorization because dirt was subtracted rather than added." (Def.'s Resp. to Rule 12(M) Statement ¶ 36)

On August 11, 1994, the EPA sent Hartz a § 308 information request regarding the Country Club Hills site. Request 11 asked Hartz to "describe in detail all conversations, and provide copies of all correspondence," between Hartz and its contractors "regarding plans to regrade and discharge fill material" into the area to be preserved. (Pl.'s Exh. 19, Request 11) Hartz's complete response to Request 11 provided: "There is no correspondence that we are

10

aware of or conversations to change the plan. Hartz Construction did not meet or talk with the Army Corp[s] during the mitigation process." (*Id.*, Resp. to Request 11)

In October 1994, one of Hartz's contractors advised the EPA that it had held discussions with Hartz regarding "the need to salvage all wetland plants and soils prior to regrading" the parcel designated for preservation at the Country Club Hills site. (Pl.'s Exh. 20, Resp. to Request 8) Hartz contends that "regrading" meant "excavating or salvaging soil to lower the surface elevation, not merely pushing it around or adding soil." (Def.'s Resp. to Rule 12(M) Statement ¶ 42) Hartz vice-president Robert Topor states that "Hartz never sent or received any correspondence about 'regrading' or changing the elevation of the 1.1-acre preserved area." (Def.'s Exh. 1 ¶ 16)

From the parties' discussions of the term "regrading," the court cannot determine whether Hartz's interpretation of the term was reasonable or whether Hartz should have, even under its interpretation of the term, disclosed certain conversations with its contractors. As part of its summary judgment burden, the EPA must ensure that the court has sufficient background information by which to determine the reasonableness of the EPA's request, as well as the responsiveness of Hartz's answer. Because the court lacks such information, the EPA's motion for summary judgment on Count V is denied.

*Motion to Strike Affirmative Defenses*

The United States has moved under Rule 12(f) to strike eight of the twenty-four affirmative defenses asserted in Hartz's amended answer,[2] arguing that they are either

---

[2] The motion to strike, originally filed in response to Hartz's original answer, is deemed to apply to Hartz's amended answer. (*See* Minute Order dated Feb. 25, 2000)

insufficient as a matter of law or are "redundant, immaterial [or] impertinent." FED. R. CIV. P. 12(f). Motions to strike are generally disfavored, and "will be granted only if the affirmative defenses are insufficient as a matter of law or present no questions of law or fact." *MAN Roland Inc. v. Quantum Color Corp.*, 57 F. Supp.2d 576, 578 (N.D. Ill. 1999). Affirmative defenses are subject to the pleading standard of the Federal Rules of Civil Procedure; even under that liberal standard, "an allegation must include either direct or inferential allegations respecting all material elements of the claim asserted." *Id.* at 579.

Although not raised by either party, it appears that the United States' motion to strike is untimely. Rule 12(f) provides that the motion should be made before a responsive pleading is filed or, if no responsive pleading is permitted under the rules, within twenty days after service of the pleading that is subject to the motion. Hartz's answer was filed on December 3, 1999, and the United States' motion to strike was not filed until January 24, 2000. In any event, a court may consider a motion to strike even though it was not made within Rule 12(f)'s time limits. *See Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*, 508 F. Supp. 200, 201-02 n.2 (N.D. Ill. 1981). The court does so here.

Hartz's fifth affirmative defense alleges that the Corps "has no statutory authority to promulgate CWA regulations that are legislative in character and binding on and enforceable against permittees." (Answer, Affirm. Defense 5) The United States argues that this defense is futile because the Corps has broad authority to regulate the discharge of fill material into waters of the United States, including the regulation of "other waters." To the extent that this defense applies to the EPA's information requests under § 308, the defense fails because, as explained above, § 308 does not limit the EPA to requesting only that information that is called for by

regulation, much less require that such regulation be adopted by the EPA. However, to the extent that this defense applies to the Corps' authority to adopt the rules underlying Counts I through III, the court has not ruled on the issue in addressing the motions for summary judgment or the previous motion to dismiss. The court does so now, and concludes that Hartz's defense fails as a matter of law.

Hartz argues that "the Corps does not have statutory authority to promulgate CWA regulations because that authority is vested solely in EPA." (Def.'s Mtn. to Strike Resp. at 4) However, CWA § 404 grants the Corps authority to issue permits for the discharge of dredged or fill materials into waters of the United States. 33 U.S.C. § 1344(a). The Supreme Court, in reviewing the Corps' CWA regulations, has held that "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *Riverside Bayview Homes, Inc.*, 474 U.S. at 131. While, as Hartz points out, the *Riverside* Court may not have expressly addressed whether the Corps had the statutory authority to adopt the regulations at issue, this court discerns in Hartz's argument no grounds on which to conclude that such authority is lacking. It appears entirely reasonable that the Corps, in fulfilling its express statutory duty to issue permits under the CWA, would promulgate regulations such as those at issue in this case. Hartz's contention that § 1361(a) "authorizes EPA (but not the Corps) to prescribe such regulations as are necessary to carry out CWA functions" is only half-right. (Def.'s Mtn. to Strike Resp. at 4 n.13) That provision allows the EPA Administrator "to carry out his functions" under the Act. 33 U.S.C. § 1361(a). It says nothing about the Corps' authority to prescribe regulations implementing § 404.

More broadly, Hartz's arguments presume that such legal issues are inappropriate for

13

resolution on a motion to strike. (*See* Def.'s Mtn. to Strike Resp. at 4 ("The government argues the underlying issue as if it could be decided on a motion to strike . . . .")) Whether an affirmative defense is legally sufficient can and should be resolved on a motion to strike. *See* FED. R. CIV. P. 12(f). Because Hartz has offered no reason to conclude that the Corps lacks statutory authority to promulgate its § 404 regulations, and in light of the decades-long acceptance and enforcement of such regulations by courts, *see Riverside Bayview Homes, Inc.*, 474 U.S. at 123-24 (recounting development in 1970s of § 404 regulations by Corps), the court strikes Hartz's fifth affirmative defense.

Hartz's tenth affirmative defense alleges that the United States is estopped from pursuing its enforcement case as to the Alsip site because the EPA and the Corps did not object after learning of Hartz's plans to resume landclearing at the site. The United States argues that the defense fails for three reasons: first, because Hartz has not alleged "affirmative misconduct" by the government, as required to establish equitable estoppel against the government; second, because Hartz does not allege that it relied to its detriment on the actions of the EPA or the Corps; and third, any reliance by Hartz was unreasonable because it should have known that it could not lawfully resume discharges until its enforcement dispute with those agencies was resolved. Hartz insists that affirmative misconduct is just one of the factors determining the availability of estoppel, along with the type of government activity being pursued, the reasonableness of plaintiff's reliance, and the potential dangers posed by estoppel to federal interests or the public fisc, citing *Portmann v. United States*, 674 F.2d 1155 (7th Cir. 1982).

In *Portmann*, the court indeed recognized that these other factors should be considered in the estoppel inquiry. However, the *Portmann* court did not suggest that affirmative misconduct

by the government was not required. Indeed, the court approved of the five estoppel requirements set forth by the Ninth Circuit, including the requirement that "the government action upon which estoppel is to be based, must amount to affirmative misconduct." *Id.* at 1167 (quoting *TRW, Inc. v. Federal Trade Comm'n*, 647 F.2d 942, 951 (9th Cir. 1981)). Subsequent Seventh Circuit case law has unmistakably established that affirmative misconduct by the government – amounting to more than mere negligence – is a prerequisite to estoppel. *See, e.g.*, *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000) ("In addition to the four elements that must be satisfied to invoke estoppel against a private party, equitable estoppel against the government requires a fifth: that the government has engaged in 'affirmative misconduct' . . . . This is more than mere negligence.").

Alternatively, Hartz insists that the government's silence constitutes affirmative misconduct under these circumstances because "Hartz and EPA were embroiled in an administrative dispute over the meaning of landclearing (Alsip) and excavation (Country Club Hills) rules and because the nationwide permit program authorizes certain activities after a finite period of Corps silence." (Def.'s Mtn. to Strike Reply at 3) The United States responds that Hartz knew or should have known that it could not lawfully resume discharges until its enforcement disputes with the agencies were resolved, citing two regulations to that effect, 33 C.F.R. §§ 326.3(e)(iv), 330.6(d)(2). Hartz replies that the United States "cites no Corps regulations that revoke a nationwide permit in such circumstances or that authorize the Corps to withhold processing of a pre-construction notice for a nationwide permit." (Def.'s Mtn. to Strike Reply at 4) It appears to the court that Hartz's argument is most likely foreclosed by the regulations cited by the United States. However, the parties' somewhat cursory, back-and-forth

invocation of regulations, coupled with the incomplete factual record before the court, leaves the court less than certain that Hartz's estoppel claim is foreclosed as a matter of law. This issue will need to be addressed more carefully and completely before such a determination can be made. For the time being, Hartz can maintain its tenth affirmative defense. For the same reason, the court declines at this time to strike Hartz's twenty-second affirmative defense, which alleges estoppel based on the government's bad faith failure to respond to Hartz's resumption of work at Alsip.

The United States also moves to strike the eighteenth affirmative defense, in which Hartz argues that this action, as it relates to the Country Club Hills site, was brought in bad faith and the government should be estopped from seeking penalties or additional mitigation because "when Hartz volunteered to restore the original elevation of the sedge meadow, the Corps refused." (Answer, Affirm. Defense 18) To the extent that Hartz argues that the United States should be estopped from seeking additional mitigation, this may prove to be a valid defense. The government's refusal of workable and effective mitigation, followed by a suit seeking the same mitigation, could – depending on the facts proven at trial – constitute affirmative misconduct on which to base an estoppel determination. However, to the extent that the defense seeks to preclude the United States from seeking penalties, the defense fails. The Corps' refusal to accept Hartz's proposed restoration is irrelevant to the imposition of penalties. As discussed below, the imposition of a penalty is mandatory where a CWA violation is established. The portion of the eighteenth affirmative defense seeking to estop the government from recovering penalties is stricken.

The United States moves to strike a portion of Hartz's eleventh affirmative defense,

which contends that no penalty or mitigation is appropriate "because the wetlands filled at Alsip were mitigated on an adjoining site to compensate for adverse effects, and the mitigation is performing in accordance with typical permit standards for mitigation performance." (Answer, Affirm. Defense 11) The United States argues that this defense is futile as applied to penalties because, once a violation of the Clean Water Act is established, the imposition of a civil penalty is mandatory. For the same reason, the United States urges the court to strike Hartz's nineteenth affirmative defense, which alleges that no penalty or mitigation is appropriate "because the original sedge meadow in the 1.1-acre area at Country Club Hills is still sedge meadow and the entire 1.1-acre area is now performing in accordance with permit standards for wetland mitigation, none of which would have happened had the surface elevation not been lowered." (Answer, Affirm. Defense 19)

Hartz argues that the language from § 309(d) relied on by the government – providing that "any person who violates [a certain provision of the Act or a permit] shall be subject to a civil penalty" – requires only that a district judge *consider* imposing a penalty. Hartz's interpretation has been rejected by the three circuit courts to have addressed the issue, *see Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir.), *cert. denied*, 516 U.S. 955 (1995); *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990); *Stoddard v. Western Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986), and this court finds it similarly unpersuasive. The language used in § 309 would be a very peculiar way of instructing judges that they are merely to consider the imposition of penalties against violators. The court strikes the eleventh and nineteenth affirmative defenses to the extent that they contend that penalties are inappropriate even if violations are established.

The United States argues that Hartz's fourteenth affirmative defense should be stricken because it is substantially similar to, and thus redundant of, the thirteenth defense. The court finds that the defenses are similar, but not redundant. The thirteenth defense alleges that by approving the permit plan for the Country Club Hills site, the Corps authorized the change in elevation. The fourteenth defense alleges that the permit's terms affirmatively required the elevation change. Both defenses may be maintained.

In its twenty-first affirmative defense, Hartz contends that no complaint or penalty is appropriate for the Country Club Hills site because the Corps negligently reviewed Hartz's site plans prior to approval. The United States argues that this essentially is an estoppel defense, and that it must fail because affirmative misconduct beyond mere negligence is required for estoppel to apply against the government. Hartz responds that the defense "may or may not be enough to estop this action (the affirmative defense of estoppel having been raised elsewhere), but at the very least, it mitigates any penalty under Section 309." (Def.'s Mtn. to Strike Resp. at 14) Hartz may be correct that the Corps' negligence may affect the size of any penalty, but that is not what the twenty-first defense alleges. Rather, the twenty-first defense contends that the Corps' negligence renders any complaint or penalty inappropriate. Because negligence is an insufficient basis for estoppel, *see Gibson*, 201 F.3d at 994, and some penalty is mandatory where a violation is established, as discussed above, Hartz's twenty-first defense must fail, and thus is stricken.

## Conclusion

For the above reasons, the United States' motion for summary judgment is granted as to Count IV, but is denied as to Count V. Hartz's cross-motion for summary judgment is denied. The United States shall submit a brief proposing a penalty under Count IV by September 8, 2000.

Hartz shall respond by September 22, and the United States shall reply by October 6.

The United States' motion to strike is granted in part and denied in part. Hartz's fifth and twenty-first affirmative defenses are stricken in their entireties. The eleventh, eighteenth, and nineteenth affirmative defenses are stricken in part, as discussed above.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:   August 16, 2000